**MATHEWSON CORPORATION,**
Plaintiff, Appellee,

v.

**ALLIED MARINE INDUSTRIES, INC.,**
Defendant, Appellee.

**Brad Foote Gear Works, Third-Party**
Defendant, Appellant.

No. 86–2089.

United States Court of Appeals,
First Circuit.

Heard June 4, 1987.

Decided Sept. 1, 1987.

Gary D. Buseck with whom Robert M. Hacking and Parker, Coulter, Daley & White, Boston, Mass., were on brief, for appellant.

Morton H. Clark with whom R. John Barrett, Vandeventer, Black, Meredith & Martin, Norfolk, Va., Astrid Glynn and Glynn & Dempsey, Boston, Mass., were on brief, for appellee Allied Marine Industries, Inc.

Before COFFIN, DAVIS* and SELYA, Circuit Judges.

SELYA, Circuit Judge.

Having conducted negotiations in a leisurely sort of way, the appellant, Brad Foote Gear Works, Inc. (Foote), let a settlement offer linger overlong on the table. Evincing great displeasure when its outstanding offer was finally accepted, Foote hastily repented and tried to upset the applecart. The district court held Foote to its bargain, and this appeal ensued. We affirm.

## I. DOWN THE EAST RIVER.

In 1983, appellee Mathewson Corporation (Mathewson) brought suit in the United States District Court for the District of Massachusetts against another present appellee, Allied Marine Industries, Inc. (Allied). Mathewson sought to recover $205,-000 allegedly due for its installation of outdrive propulsion units on a vessel owned by Allied. The defendant not only disclaimed the debt but countersued, charging that the units were defective. Alleging that economic losses of close to $2,000,000 had been sustained, the counterclaim sought recovery of those damages.[1]

Mathewson, as defendant in counterclaim, initiated a third-party action against the present appellant. Asserting both admiralty and diversity jurisdiction, Mathewson alleged that any failure in the performance of the outdrive units was attributable to Foote (which had supplied the gears used in them). The third-party plaintiff sought (i) contribution for negligence under M.G.L. ch. 231B, and (ii) noncontractual indemnity under a strict liability theory. There followed considerable pretrial skirmishing, much of which can be left unremarked for our purposes. After summary adjudication of the strict liability claims, a bench trial on the negligence issues began. On May 1, 1986, five days into the trial, a recess was declared. Though the adjournment was anticipated to last for but two weeks, the trial never resumed.

Like a thunderhead hovering in the mackerel sky, the Third Circuit's decision in *East River S.S. Corp. v. Delaval Turbine, Inc.*, 752 F.2d 903 (3rd Cir.) (en banc), *cert. granted*, 474 U.S. 814, 106 S.Ct. 56, 88 L.Ed.2d 45 (1985), hung heavy over the litigation. All of the parties understood that the Supreme Court had heard arguments in *East River* in January 1986 and that the Court's impending decision augured special significance for this litigation. It was widely surmised that the

---

* Of the Federal Circuit, sitting by designation.

1. Allied's claimed damages comprised purely economic loss—which in this context has been defined as "the costs associated with repair and/or replacement of a defective product, or loss of profits consequent thereto, apart from any injury or damage to other property," *Hart Engineering Co. v. FMC Corp.*, 593 F.Supp. 1471, 1481 n. 11 (D.R.I.1984).

Court, one way or the other, might resolve the viability of product liability claims for purely economic loss in admiralty jurisdiction. Yet, the resultant uncertainty did not stall all negotiations in the case at bar. Without waiting endlessly on the bank of *East River*, Allied and Mathewson settled all of their differences on May 12, 1986. They elected to keep the details of their arrangement confidential, and did not reveal the terms to Foote.[2] The settlement agreement expressly preserved the claim for third-party liability against Foote, but placed that initiative, essentially, under the control of Allied. Although Mathewson retained a right of approval as to any negotiated accord of the third-party action, it was agreed that Allied's counsel would pull the laboring oar in further proceedings. The district court was seasonably apprised of the partial settlement.

Negotiations continued as to the balance of the litigation. On June 10, Foote's attorney called Allied's lawyer and offered $100,000 in exchange for general releases. There was no time limit on how long the offer was to remain open. The proposition was bare of other express contingencies as well. Allied's counsel promptly conveyed the proposal to William Law, appellee's president, without making any recommendation. Law apparently decided to take the matter into his own hands, *i.e.*, under advisement. Some six days later, the clap of thunder was heard in the land. On June 16, the Supreme Court decided *East River*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), holding that "whether stated in negligence or strict liability, no products-liability claim lies in admiralty when the only injury claimed is economic loss." *Id.* at 2305. The following day, Allied (admittedly aware of the status of *East River*) accepted Foote's settlement offer. Mathewson's assent followed lickety-split. And, the appellees informed the district court of the agreement.

On June 20, Foote dropped the other shoe, advising all concerned that it regarded the offer as having "expired" coincident with the resolution of *East River*. That being so, the purported acceptance was, in Foote's view, a nullity. The appellees took no shine to such a notion. They promptly moved to enforce the settlement. An agreed statement of facts—from which much of the foregoing narrative is drawn—was formulated and arguments were entertained. In a rescript dated October 23, 1986, the district court upheld the bargain and granted specific enforcement of the settlement. Foote was ordered to remit $100,000 to Allied within thirty days "upon the execution ... of mutually acceptable releases." This appeal followed.

## II.  SHOOTING THE RAPIDS.

We start by lauding the prudential policy favoring settlement as a preferred alternative to costly, time-consuming litigation. As any litigator or judge can attest, the best case is a settled case. We have characterized a settlement negotiated, as here, "under the eyes of the court [as] a most solemn undertaking...." *Warner v. Rossignol*, 513 F.2d 678, 682 (1st Cir.1975). Without doubt, a district court possesses the authority to insure due compliance with such a pact. *See Dankese v. Defense Logistics Agency*, 693 F.2d 13, 16 (1st Cir. 1982) (district court "retains an inherent power to supervise and enforce settlement agreements entered into by parties"); *Crown Life Insurance Co. v. Springpark Associates*, 623 F.2d 1377, 1380 (9th Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980) (similar); *Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir.1974) (per curiam) (similar). We agree generally with the Fifth Circuit that, "[w]here the parties, acting in good faith, settle a controversy, the courts will enforce the compromise without regard to what the result might have been had the parties chosen to litigate." *Terrain Enter-*

---

**2.** Foote apparently acceded to this stonewalling tactic. Thus, this case does not present the question of whether a nonsettling party may compel the disclosure of an accord reached between other parties. *Compare, e.g., Bennett v.*

*Lapere,* 112 F.R.D. 136 (D.R.I.1986) (favoring disclosure) *with Bottaro v. Hatton Associates,* 96 F.R.D. 158 (E.D.N.Y.1982) (favoring nondisclosure).

*prises, Inc. v. Western Casualty and Surety Co.,* 774 F.2d 1320, 1321 (5th Cir. 1985), *cert. denied,* — U.S. —, 106 S.Ct. 1639, 90 L.Ed.2d 184 (1986). Thus, the district court had ample authority to discern whether or not a valid and binding settlement had been reached, and if so, to enforce it.

The appellant presents a medley of arguments to support the claim that the district court erred in exercising this acknowledged power. Viewed realistically, certain of these points can be, and by this reference are, rejected without discussion. Those which remain telescope into two basic contentions. First, Foote maintains that Allied's purported acceptance was nugatory because the offer lapsed before the acceptance occurred, *i.e.,* when the Court's decision in *East River* surfaced. Second, even if the acceptance were timely, *East River* so eviscerated the third-party complaint that any agreement to pay was necessarily void for want of consideration. We address these contentions *seriatim.*

### A. *Timeliness of the Acceptance*

■ It is hornbook law that an offeree's power of acceptance vanishes at the time specified in the offer, and if no deadline is prescribed, "at the end of a reasonable time." Restatement (Second) of Contracts § 41(1) (1979); *Minneapolis & St. Louis Ry. v. Columbus Rolling Mill,* 119 U.S. 149, 151, 7 S.Ct. 168, 169, 30 L.Ed. 376 (1886). Courts in Massachusetts[3] have long endorsed this hoary principle, *e.g., Loring v. Boston,* 48 Mass. 409, 412–13 (1844), holding that "[w]hat is a reasonable time depends on all the circumstances of the case." *Powers, Inc. v. Wayside, Inc. of Falmouth,* 343 Mass. 686, 691, 180 N.E.2d 677 (1962). Foote's offer to Allied having been bereft of any deadline, our inquiry reduces to whether or not the appellee's acceptance of the offer seven days after it was made occurred within a reasonable time. We find it did.

In urging that its week-old settlement offer lapsed prior to Allied's telexed acceptance, appellant maintains that the offer was impliedly conditioned, in a temporal sense, on the uncertain status of *East River.* The announcement of the Court's opinion, this thesis runs, so radically altered the contours of the dispute between Allied and Mathewson, and so shook the underpinnings of the settlement negotiations, that it rendered a post-*East River* acceptance of a pre-*East River* offer unreasonable as a matter of law. In this vein, the appellant seeks to characterize its negotiations with Allied (and the ensuing offer) as a hedge—a mutually understood hedge— against the uncertainty of what might happen in *East River.* And, it asserts that the offer, brimming with vitality when made, turned stone cold dead by necessary implication once the Court's *East River* decision removed so major an unknown variable from the calculus of negotiations.

The fundamental problem with Foote's stance is that it sidesteps the established principle that "contracts depend on objective manifestations of consent and not on uncommunicated subjective expectations." *Bushkin Associates, Inc. v. Raytheon Co.,* 815 F.2d 142, 146 (1st Cir.1987). There are no *objective* facts to suggest that Allied knew or should have known that the settlement offer was conditioned on *East River*

---

3. The parties concur that Massachusetts law governs the enforceability of this agreement. They have briefed and argued the question in those terms and the district court ruled on that basis. We, however, are not so certain. Settlement of a case already in progress in the federal courts implicates matters of considerable federal concern, entirely apart from the substantive merits. In such situations, the federal interest is sufficiently great that the proper rule of decision may well be a uniquely federal one. *See Gamewell Mfg., Inc., v. HVAC Supply, Inc.,* 715 F.2d 112, 115 (4th Cir.1983) ("we believe that the standards by which [federal court] litigation may be settled, and hence resolved short of adjudication on the merits, are preeminently a matter for resolution by federal common law principles"). Nonetheless, though noting the point, we leave a definitive answer for another day; in this case, we are confident that, by whichever standard the efficacy of the settlement is measured, the result would not vary. Moreover, given the expressed preference of the parties, we are at liberty to accept their "implicit concession" that Massachusetts law controls. *See Oman International Finance Ltd. v. Hoiyong Gems Corp.,* 616 F.Supp. 351, 358 n. 5 (D.R.I. 1985).

remaining unresolved. We think it highly significant in this respect that these negotiations transpired between sophisticated business entities represented by seasoned counsel. Foote, as the offeror, was in the best position to enumerate the contingencies, if any, which it now insists lay at the core of its submission. It could easily have conditioned the offer on the continued absence of a decision in *East River;* more commonplace still, it could have imposed an explicit deadline for acceptance (after which, the tender would be deemed withdrawn). Alternatively, if *East River* were indeed the talisman, Foote had the ability to await its resolution before placing any offer on the table. Use of any of these rather pedestrian mechanisms would have fully protected the appellant against the injustice which it now perceives—but Foote blithely eschewed them all. Whether by intention or oversight, Foote gave Allied a more favorable roll of the dice: an offer to settle tied neither to *East River* nor to some specific time line.[4]

When Foote stumbled in this regard, the appellee was entitled to assume that the offer was as it appeared on its face: unconditional and subject to acceptance within a reasonable time, so long as not sooner revoked. This is particularly so because when Allied elected to take the offer under advisement—thus setting the stage for a response, if one was to be forthcoming, at some indeterminate future date—the appellant raised no protest. Whatever temporal limitations Foote may now claim to have had in mind, the offer plainly failed to reflect any such understandings and the conduct of the parties revealed none. A court must be loath to inject itself into the resultant vacuum. As we had recent occasion to note in analogous circumstances, "[i]t is unbefitting that we accomplish by judicial fiat what [a party] neglected to achieve contractually." *RCI Northeast Services Division v. Boston Edison Co.,* 822 F.2d 199, 204 (1st Cir.1987); *cf. New England Structures, Inc. v. Loranger,* 354 Mass. 62, 68, 234 N.E.2d 888 (1968) (inappropriate for court to imply contract provision when parties would naturally have been expected to include it, had that been their intention).

The appellant attacks Allied's delayed acceptance on a related basis as well. Even if a week were, on its face, a fair time span within which to respond to a settlement overture in a protracted litigation, Foote argues, Allied's unilateral decision to await resolution of *East River* allowed it to speculate at Foote's expense. So, Foote reasons, the appellees' assent occurred too late in the day.

In support of its position, the appellant relies upon Restatement (Second) of Contracts § 41 comment f (1979) ("If the offeree makes use for speculative purposes of the time allowed for communication, there may be a lack of good faith, and an acceptance may not be timely even though it arrives within the time contemplated by the offeror."), and some rather scanty caselaw, a fair exemplar of which is *Coleman v. Davies,* 39 Wash.2d 312, 235 P.2d 199 (1951). In *Coleman,* the prospective buyer transmitted a written offer to the plaintiff in May for the purchase of raspberries based on the "packer's opening price" on July 15. The plaintiff, a grower, sat on the offer until August (well after the July 15 price had been announced), and then attempted to accept it. The Washington Supreme Court ordered judgment to enter for the defendant (prospective purchaser), stating:

> The price was indefinite until it was fixed within the industry at the beginning of the packing season....
>
> Up until that time, each of the parties was assuming a risk as to what the price would be. However, after that time [the seller] knew what the contract price of these raspberries was and ... could ei-

---

4. The roll of the dice was not, however, a free one. By its footdragging, Allied ran some risk. After all, Foote retained the ability to revoke its settlement proposal at any time before acceptance; thus, a withdrawal could well have followed on the heels of the Supreme Court's decision, thereby leaving the offeree up the *East River* without the proverbial paddle. *See* Farnsworth, *Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations,* 87 Colum.L.Rev. 217, 221–22 (1987).

ther claim that [the contract] was in effect or not as he deemed advisable.

235 P.2d at 202–03. The tribunal held, accordingly, that the "reasonable time" for accepting the offer expired with the announcement of the packer's opening price. *Id.* at 203.

Cases such as *Coleman* are distinguishable from the case at bar in at least two critical respects. First, in such cases—unlike this one—the contract term (say, the price of raspberries) is itself the variable. Once that term becomes determinate, the essence of the offer evaporates. That is not true where the variable (say, the decision in *East River*) is not an element of the bargain, but at best an indirect influence upon it. The second respect is perhaps a mirror image of the first: in the *Coleman* type of situation, unlike here, any and all uncertainty regarding the value of the subject matter of the negotiations will have dissipated prior to the time of the purported acceptance.[5]

*Coleman* illustrates the point. There, raspberries (of unknown value when the offer was transmitted and received) were priced precisely by the market before the seller deigned to act. It was, therefore, neither fair nor reasonable for the offeree to assume that the antecedent proposal was yet live at the moment of attempted acceptance. The very thing about which the parties were speculating as to value, *i.e.,* what would be the packer's opening price for raspberries, had become capable of objective, exact, and risk-free valuation before any contract was cemented. To hold that the essayed acceptance in *Coleman* was timely would have been tantamount to allowing bets to be placed after the race had been run and the results posted.

The case at bar is built to quite a different last. The olive branch which Foote

extended cannot credibly be characterized as a wager on the outcome of *East River*. These parties, like litigants everywhere, were bargaining over their own case, not over the worth either of *East River* or of the decision in *East River* vis-a-vis their own dispute. The value of the matter under negotiation between Allied and Foote was not cast in concrete by the occurrence of the intervening event (the handing down of the Court's opinion). Notwithstanding that *East River* was relevant to the merits of the third-party action, notwithstanding that common sense suggests that the likely outcome of *East River* figured prominently in each side's private evaluative calculations, the settlement value of the claim in this case was not, and could not be, determined by the decision in *East River* alone. *Cf.* Note, *Private Settlement as Alternative Adjudication: A Rationale for Negotiation Ethics,* 18 U.Mich.J.L.Ref. 503, 515 n. 61 (1985) (one cannot "presum[e] that projected *legal* rights are the principal determinants of negotiated agreements.... [O]ther considerations incident to bargaining power, such as relative financial strength and eagerness to avoid trial, are often vitally important to both the process and ultimate content of private settlements") (emphasis in original). There is, as any courtroom veteran can attest, no broad market by which one can measure precisely the objective value of a lawsuit. Short of verdict—and laying aside, even then, the spectre of posttrial motions and appeals— "settlement value" arises out of the worth which the parties themselves, subjectively, attach to their litigation. Typically, such evaluations are the product of intangible criteria which defy quantification. Foote might have offered $100,000 to buy peace of mind, avert risk, eschew adverse publicity, put an end to stressful and disruptive litigation, or any or all of the above. By the same token, Allied might reasonably

---

**5.** Looked at from yet another vantage point, the view remains much the same. In *Coleman,* when the purchase offer was made, all parties knew that the price of raspberries would be set by a particular date. The same certitude did not attend the instant case. When Foote extended its offer, all that the parties knew was that, at some unknown (and unknowable) future date,

the Court would take action in respect to *East River*. Unlike the fixing of a commodity price, the decision could have impacted this litigation (or not) in a stunning variety of ways, depending not only on what the Court did (*e.g.,* affirm, reverse, vacate, dismiss certiorari as improvidently granted) but on what the Court said (or neglected to say) in announcing its opinion(s).

have believed that the third-party claims had a potential far in excess of $100,000 (regardless of how or when *East River* came down). Unlike the grower in *Coleman*, who had a "sure thing" when he belatedly elected to sell, it cannot be divined with any certainty whether the appellee, when it accepted Foote's offer, agreed to take more or less than its claim was "worth". And, the need for the efficient management of litigation, coupled with the policy considerations which counsel in favor of settlement, *see ante*, preclude us from attempting, after the fact, to probe this motivational mire more deeply.

■ Refined to bare essence, appellant's lapsed offer argument is little more than a self-serving attempt to refashion its proposal with the benefit of hindsight. The plea calls upon us to read into Foote's settlement overture a time limitation which was not, either expressly or by fair implication, a condition of it. We decline to do so. "It is no appropriate part of judicial business to rewrite contracts freely entered into between sophisticated business entities." *RCI Northeast Services Division*, 822 F.2d at 205. When the transaction is commercial, the principals practiced and represented by counsel, and the contract itself reasonably clear, it is far wiser for a court to honor the parties' words than to imply other and further promises out of thin air. *See Allied Communications Corp. v. Continental Cellular Corp.*, 821 F.2d 69, 73–74 (1st Cir.1987). We quite agree with Judge Learned Hand that, in business dealings, "it does not in the end promote justice to seek strained interpretations in aid of those who do not protect themselves." *James Baird Co. v. Gimbel Bros., Inc.*, 64 F.2d 344, 346 (2d Cir.1933).

## B. *Consideration*

■ The appellant's remaining contention need not arrest us long. Foote asserts that, if a settlement contract was formed at all, such a pact lacks consideration and cannot be enforced. This argument, too, is immersed in *East River*. According to appellant, once the Supreme Court's opinion had issued, no cause of action remained available to Allied against Mathewson; thus, no recovery could lie against Foote on the third-party complaint. Though superficially appealing, Foote's stance cannot survive close scrutiny.

In Massachusetts, the law is settled that forbearance to press a claim will constitute adequate consideration for a settlement agreement so long as the claim is not "vexatious or frivolous." *Blount v. Wheeler*, 199 Mass. 330, 336, 85 N.E. 477 (1908). *Cf. Price v. Price*, 348 Mass. 663, 668, 204 N.E.2d 902, *cert. denied*, 382 U.S. 820, 86 S.Ct. 47, 15 L.Ed.2d 66 (1965) ("[F]orbearance to pursue a claim known to be frivolous would not constitute good consideration...."). The Massachusetts Supreme Judicial Court has stated that "the abandonment or postponement of an honest purpose to [proceed with] litigation believed to be well founded and not frivolous, vexatious or unlawful, although not of such character in law or fact or both as finally to commend itself to the judgment of the tribunal of last resort, is the surrender of a thing of value and is a sufficient consideration for a contract." *Codman v. Dumaine*, 249 Mass. 451, 458, 144 N.E. 408 (1924). *See generally* 15A Am.Jur.2d *Compromise and Settlement* § 17 (1965) ("If a compromise is based on a claim asserted in good faith, the compromise agreement will not be ... void for lack of consideration merely because it ultimately appears that the claim could not have been sustained at law...."). These authorities comport, too, with common sense: if the ability successfully to settle a suit was dependent upon judicial resolution of the validity of the cause of action, a compromise—instead of being a way to avoid or terminate litigation—would be but a further complication in the evolution of it.

Foote's position does not toe this mark. On any view of the case, and accounting generously for the impact of *East River*, Allied's claims were by no means frivolous or vexatious. The most *East River* can arguably be read to hold is that damages for the purely economic loss sustained by Allied cannot be recovered under maritime law. *See, e.g.*, 106 S.Ct. at 2305. Nevertheless, jurisdiction in this case rested on

diversity as well as admiralty. Allied's counterclaim sounded land-based actions for negligence and strict liability under Massachusetts law. In corresponding fashion, Mathewson's third-party complaint against Foote sought, *inter alia*, contribution under M.G.L. ch. 231B. These state law claims may or may not survive *East River;* that is not the point. What is perfectly clear is that they at least arguably survive, and in so doing, continue to present genuine issues for further litigation. Indeed, the very factor which the appellant sees as its savior—the impact of *East River*—is itself sufficiently diffused that a litigable issue fairly exists as to the manner and extent that *East River* applies to this case (and especially, to the issues of state law raised herein). Any attempt to characterize such weighty questions as "frivolous" or "vexatious" simply will not wash. Forbearance to pursue the same in litigation, therefore, constituted adequate consideration for the settlement negotiated between the parties.

## III. PUTTING INTO PORT.

Whereas garden-variety contract negotiations implicate the interest of the contracting parties, settlement negotiations which take place in the context of ongoing litigation implicate the courts as well. There is an institutional interest in the solemnity of such agreements, in bringing certainty to the process, and in minimizing the opportunities for lawyers and litigants alike to act as Monday morning quarterbacks. It ill behooves a court, in the ordinary case, to inquire into the reasons underlying an arm's-length settlement or to attempt to calibrate peculiarly private scales in order to determine who may have gotten the better of the bargain. In a very real sense, all of the parties—and the court, as an institution—win when litigation is settled amicably short of trial.

In this instance, the appellant, confronted with what seemed a substantial expo-sure, put its best foot forward. It chose not to festoon its offer with any of the usual preconditions. It did not balk when a rejoinder failed to materialize immediately.[6] It did not withdraw the offer as the Supreme Court's decision day approached. When Allied determined that it would accept the proposal, and communicated that assent to Foote, the offer still lay placidly atop the table. Under these circumstances, it would do violence both to the fundamental tenets of contract law and to the reasonable administrative needs of a busy trial court to permit the appellant to slip free of the laces. The shoe, fitting, must be worn.

We need go no further. The district court did not err in enforcing the settlement. Upon the due execution and delivery of mutual general releases, Allied is entitled to collect the settlement amount, together with interest thereon from the date when, absent Foote's unwarranted repudiation of the settlement, the funds would likely have been paid.[7]

*Affirmed.* Costs taxed in favor of appellees.

---

6. That Allied's inaction was not meant to be taken for a rejection is at least suggested by the fact that Law, Allied's president, had replied to appellant's earlier settlement offer by refusing it on the day it was received. That prior course of dealing gave Foote, when its June 10 tender went unanswered for a spell, reason to believe that the offer was likely receiving serious consideration.

7. If the parties do not agree as to the operative date, the district court, on remand, shall determine it.