February 16, 1993

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1444

IN RE: NEWPORT PLAZA ASSOCIATES, L.P.,
Debtor.

NEWPORT PLAZA ASSOCIATES, L.P.,
Plaintiff, Appellant,

v.

DURFEE ATTLEBORO BANK,
Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Francis J. Boyle, U.S. District Judge]

Before

Selya, Circuit Judge,

Bownes, Senior Circuit Judge,

and Cyr, Circuit Judge.

Robert S. Bruzzi, with whom James J. Beaulieu was on brief,

for appellant.
Michael R. McElroy, with whom Schacht & McElroy was on

brief, for appellee.

SELYA, Circuit Judge. After entering insolvency
SELYA, Circuit Judge.

proceedings, plaintiff-appellant Newport Plaza Associates

(Newport), a Rhode Island limited partnership, commenced an

adversary proceeding against Durfee Attleboro Bank (the Bank), in

which it claimed that the Bank failed to honor an oral agreement

concerning the resumption of financing for a stalled construction

project. The bankruptcy court and the district court both

rejected the claim. The third time is not the charm: because

the record shows beyond peradventure that the parties entered

into a subsequent written contract, the terms of which directly

contradicted, and therefore superseded, the alleged oral

agreement, we affirm.

I. BACKGROUND

On February 8, 1988, Newport executed and delivered to

the Bank a promissory note, construction mortgage, and

construction loan agreement in order to finance the erection of a

shopping plaza in Newport, Rhode Island. Construction came to a

screeching halt that November due to difficulties between Newport

and its general contractor, DRL, Inc. When DRL and a number of

subcontractors placed mechanics' liens on the property, Newport

defaulted on the loan.

Newport tried repeatedly to work out an agreement under

which the Bank would be willing to restart the project. Newport

claims that on December 20, 1988, the Bank agreed to resume

financing the work pursuant to the terms of the original

construction loan agreement if Newport, within a reasonable

2

period of time, resolved the mechanics' liens, brought interest

payments current, reaffirmed occupancy commitments from third

parties, and replaced DRL with a suitably qualified builder.1

Newport also claims that it complied with these conditions no

later than March of 1989, but that the Bank reneged on the oral

agreement.

On October 13, 1989, with the project still dormant,

Newport submitted a written proposal to the Bank anent continued

financing. This proposal did not mention the oral agreement. By

letter dated November 1, 1989, the Bank notified Newport that it

had "decided not to allow restarting of the project." Instead,

the Bank offered, "without waiving any . . . rights," to accept

$881,000 in full satisfaction of the balance due ($1,381,000) on

the promissory note. The Bank's terms required Newport, if it

accepted the offer, to tender $881,000 in a lump sum within 90

days and, in the interim, to submit weekly progress reports on

the status of the project and its efforts to obtain the funds

needed to buy out the Bank's position. The letter, the text of

which is reproduced in the appendix, gave Newport two weeks in

which to accept the offer. It made no reference to the alleged

oral agreement.

Newport's partners signed and returned the letter

before the appointed deadline. Thereafter, they failed to make

the lump-sum payment within the stipulated 90-day period. When

1The Bank steadfastly denies these allegations. Since the
case was decided below on summary judgment, we assume for
argument's sake that the oral agreement existed.

3

the Bank initiated foreclosure proceedings, Newport sought the

protection of Chapter 11.2

In due course, Newport filed suit in the bankruptcy

court alleging a breach of the oral agreement. After some

procedural skirmishing, not material for our purposes, the

bankruptcy court granted the Bank's motion for summary judgment.

In re Newport Plaza Assocs., 129 B.R. 326 (Bankr. D.R.I. 1991).

The court held that the letter exchange constituted an accord

between the parties, wherein the Bank agreed to discharge

Newport's original obligation in return for Newport's timely

payment of a portion of the outstanding balance. Id. at 327.

The court ruled that because the Bank explicitly stated in the

offering letter that it would not allow restarting of the

project, and Newport accepted the terms of that letter, the

exchange "created new contractual obligations between the parties

and replaced the alleged December 20, 1988 oral agreement . . .

." Id. The bankruptcy court ruled, alternatively, that Newport

had neither established the existence of an oral agreement nor

shown performance of its obligations thereunder.3 See id. at

327 n.1.

Newport appealed. The district court convened a

2The bankruptcy court, following a contested hearing,
eventually granted the Bank's motion for relief from the
automatic stay. The foreclosure proceedings have been
consummated.

3Because this appeal is susceptible to resolution on the
ground that the letter exchange extinguished any oral agreement,
see infra, we do not consider this alternative holding.

4

hearing, afforded de novo review, and rendered summary judgment

ore tenus. In its bench decision, the district court reasoned

that whether an oral agreement existed was of no consequence, as

any such agreement was "completely inconsistent" with the

subsequent exchange of correspondence. That correspondence, the

court ruled, constituted an accord, superseding any prior

agreement between the parties. On March 3, 1992, the clerk

entered final judgment.

Newport again appeals. The gist of its argument is

that the district court erred in holding that, as a matter of

law, Newport relinquished the right to resuscitate the original

financing arrangement a right supposedly conferred by the oral

agreement when it signed and returned the November 1 letter.

Because we agree with the district court that the letter exchange

constituted a valid contract in which the parties unambiguously

expressed their mutual intention that the Bank would not supply

funds to restart the project, we reject Newport's attempt to

enforce the prior oral agreement and affirm the entry of judgment

below.

II. THRESHOLD LEGAL MATTERS

We begin by explicating certain legal principles in

order to set the stage for a discussion of the merits.

A. The Summary Judgment Standard.

The summary judgment standard is familiar and has been

frequently elucidated. Rather than attempting to reinvent so

serviceable a wheel, we merely observe that, as the civil rules

5

themselves provide, summary judgment is appropriate when "the

pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c). The opponent of a properly focused Rule

56 motion must demonstrate, by competent evidence, the existence

of a triable issue which is both genuine and material to its

claim. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48

(1986); Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir.

1990). "In this context, 'genuine' means that the evidence about

the fact is such that a reasonable jury could resolve the point

in favor of the nonmoving party." United States v. One Parcel of

Real Property, Etc. (Great Harbor Neck), 960 F.2d 200, 204 (1st

Cir. 1992). "In the same context, 'material' means that the fact

is one susceptible of altering the outcome of the litigation."

Rivera-Muriente v. Agosto-Alicea, 959 F.2d 349, 352 (1st Cir.

1992).

We afford plenary review to the entry of a summary

judgment. Garside, 895 F.2d at 48. In so doing, this court,

like the courts below, must read the record in the manner most

gratifying to the party opposing summary judgment, indulging all

reasonable inferences in that party's favor. See Rivera-

Muriente, 959 F.2d at 352; Griggs-Ryan v. Smith, 904 F.2d 112,

115 (1st Cir. 1990).

B. Choice of Law.

6

In this case, the underlying contract claim depends on

state law. The parties briefed and argued the case on the

apparent understanding that Rhode Island law governs the

significance of their actions and the interpretation of their

agreements. Both lower courts adjudicated the controversy on

that basis. When opposing parties agree to the source of the

substantive law that controls their rights and obligations, and

no jurisdictional concerns are present, a court is at liberty to

accept such an agreement without independent inquiry. See Moores

v. Greenberg, 834 F.2d 1105, 1107 n.2 (1st Cir. 1987); Mathewson

Corp. v. Allied Marine Indus., Inc., 827 F.2d 850 , 853 n.3 (1st

Cir. 1987). We do so here.

C. What's in a Name?

The parties have expended considerable effort debating

whether the November 1 letter agreement should be evaluated as an

accord and satisfaction or as a novation. We deem it unnecessary

to venture into this Serbonian bog.

The Rhode Island Supreme Court has traditionally

manifested a concern with substance rather than form in this

fuliginous corner of the law, hesitating to draw fine lines

between these two closely allied kinds of contracts where no

necessity exists for doing so. See, e.g., Mello v. Coy Real

Estate Co., 234 A.2d 667, 671-72 (R.I. 1967) (noting that

dissimilarities between the two theories are frequently of no

concern, as both "operate to discharge all the rights and

obligations emanating from a prior agreement"); Salo Landscape &

7

Constr. Co. v. Liberty Elec. Co., 376 A.2d 1379, 1382 (R.I. 1977)

(holding that, when the parties' subsequent agreement created new

contractual rights and obligations which extinguished those

arising under the original contract, "it matters not" whether a

court refers to the subsequent agreement as an accord and

satisfaction or as a rescission followed by the formation of a

new contract); see also Masse v. Masse, 313 A.2d 642, 645 (R.I.

1974) (stating that either a release or an accord and

satisfaction of an alimony judgment "will bind the parties if

fully complied with and supported by sufficient consideration").

Federal courts, construing state law, have often exhibited the

same disinclination. For example, the Seventh Circuit,

confronted with an analogous fact pattern, chose practicality

over pettifoggery. See Calder v. Camp Grove State Bank, 892 F.2d

629, 633 (7th Cir. 1990) (concluding that a "difference in the

characterization of the [agreement] does not affect the outcome

of this case, since, under Illinois law releases, novations, and

accords and satisfactions are all contracts subject to the

requirement of mutual intent and the constraints of the parol

evidence rule").

The lesson to be learned from all of this is that, when

it would serve no useful purpose to distinguish between accord

and satisfaction, on the one hand, and novation, on the other

hand, courts should refrain from performing what will amount to

no more than an exercise in semantics. So it is here. If the

November 1 agreement constitutes a valid contract, it binds the

8

parties in substantially the same manner whether we call it an

accord and satisfaction or a novation, operating to discharge all

the rights and obligations emanating from the preexisting oral

agreement.

III. ANALYSIS

The crux of this appeal involves a dispute over the

interpretation of the letter agreement. We have recognized that,

in certain circumstances, summary judgment is an appropriate

vehicle for resolving contract-interpretation disputes. The key

is the lack of any ambiguity. See FDIC v. Singh, 977 F.2d 18, 21

(1st Cir. 1992); see also Fashion House, Inc. v. K Mart Corp.,

892 F.2d 1076, 1083 (1st Cir. 1989) (same rule applies in

directed-verdict context). It is only when ambiguity looms that

the interpretation of contract language, itself acknowledged,

becomes a question of fact for the jury rather than a question of

law for the judge. See Singh, 977 F.2d at 21; In re Navigation

Technology Corp., 880 F.2d 1491, 1495 (1st Cir. 1989). These

principles are in overall harmony with Rhode Island's

jurisprudence. See, e.g., Judd Realty, Inc. v. Tedesco, 400 A.2d

952, 955 (R.I. 1979); Fryzel v. Domestic Credit Corp., 385 A.2d

663, 666-67 (R.I. 1978); O'Connor v. McKanna, 359 A.2d 350, 353

(R.I. 1976).

Under Rhode Island law, the determination of whether a

contract's terms are ambiguous is itself a question of law for

the court. See D.T.P., Inc. v. Red Bridge Properties, 576 A.2d

1377, 1381 (R.I. 1990); Westinghouse Broadcasting Co. v. Dial

9

Media, Inc., 410 A.2d 986, 991 (R.I. 1980); accord Fashion House,

892 F.2d at 1083. Generally, the Rhode Island Supreme Court will

deem contract language to be ambiguous when and if it is

"reasonably susceptible of different constructions."

Westinghouse, 410 A.2d at 991; accord Fryzel, 385 A.2d at 667.

Conversely, a contract which within the realm of reason can bear

only a single plausible interpretation can be so construed by the

court as a matter of law. See O'Connor, 359 A.2d at 354. Given

similar parameters of substantive law, we have affirmed the

granting of summary judgment where the words of a contract are so

clear that "reasonable people could not differ over their

meaning." Boston Five Cents Sav. Bank v. Secretary of Dep't of

HUD, 768 F.2d 5, 8 (1st Cir. 1985); accord Singh, 977 F.2d at 21;

Fowler v. Boise Cascade Corp., 948 F.2d 49, 54 (1st Cir.

1991).4

Where the language of a contract is clear and

unambiguous, the Rhode Island Supreme Court has generally

interpreted the parties' intent based solely on the written

words.5 See D.T.P., Inc., 576 A.2d at 1381; Dudzik v. Leesona

4The Rhode Island Supreme Court has elucidated a similar
standard in applying its own summary judgment rule. See Cassidy

v. Springfield Life Ins. Co., 262 A.2d 378, 380 (R.I. 1970);

O'Connor, 359 A.2d at 354.

5At least one Rhode Island case also looked to the parties'
circumstances at the time the contract was made both to ascertain
whether a term was ambiguous as used and to determine the
parties' intent in using an otherwise unambiguous term. See

Westinghouse, 410 A.2d at 992. We need not dwell on this

distinction, however, as consideration of the parties'
circumstances in this case would only strengthen the
interpretation of the letter agreement suggested by its plain

10

Corp., 473 A.2d 762, 765 (R.I. 1984); Fireman's Fund Ins. Co. v.

E.W. Burman, Inc., 391 A.2d 99, 102 (R.I. 1978). Unambiguous

language is to be accorded its plain and natural meaning. See

Dudzik, 473 F.2d at 765; cf. Flanagan v. Kelly's System of N.E.,

Inc., 286 A.2d 249, 251 (R.I. 1972) (construing Florida law but

indicating in dictum that Rhode Island law is identical in this

respect).

We employ these tools in analyzing Newport's assertions

that issues of fact, related to the interpretation of the letter

agreement, precluded the granting of summary judgment.

A. Acceptance of the Agreement.

We first address Newport's claim that there remains an

issue of disputed material fact as to whether, by signing and

returning the November 1 letter in the manner requested, it

intended to accept the proposed terms and thereby form a binding

contract. Newport argues that, in the letter, the Bank agreed to

release Newport from its loan obligations only upon Newport's

performance of three acts: (1) returning the letter, signed as

accepted, within two weeks; (2) delivering a certified check for

$881,000 within the period prescribed for payment; and (3)

transmitting written progress reports betweentimes. Because

Newport performed only one of the three acts return of the

letter it envisions an issue of fact regarding whether it

intended to accept the November 1 offer. Although we give

language.

11

appellant's counsel high marks for ingenuity, we do not believe

that the letter can be construed in so elastic a manner.

Under Rhode Island law, the Bank, as the offeror,

controlled the offer and the terms of its acceptance. See B & D

Appraisals v. Gaudette Mach. Movers, Inc., 733 F. Supp. 505, 508

(D.R.I. 1990). It is a basic tenet of contract law that an

offeror may, as a condition of the offer's acceptance, call for

an act, a forbearance, or a return promise from the offeree in

exchange for the offeror's promise or performance. See

McLaughlin v. Stevens, 296 F. Supp. 610, 613 (D.R.I. 1969). So

long as the offeror sets forth what is being sought in reasonably

certain terms, he may bind the offeree immediately by requiring

acceptance in the form of a return promise rather than through

performance. See B & D Appraisals, 733 F. Supp. at 508.

Viewed against this backdrop, Newport's position

appears totally irreconcilable with the unambiguous language of

the Bank's November 1 letter. After setting forth the terms of

the offer, the Bank states the terms of its acceptance: "If you

are in agreement with the terms and conditions detailed above,

please so indicate by dating, executing and returning one copy of

this letter for our files." This language is nose-on-the-face

plain: the Bank asked for a return promise nothing more as

the indicium of acceptance.

Should any doubt linger, we are quick to remark that a

court is duty bound to construe contractual terms in the context

of the contract as a whole. See Woonsocket Teachers' Guild,

12

Local 951 v. School Comm. of the City of Woonsocket, 367 A.2d

203, 205 (R.I. 1976). Here, the letter, read in its entirety,

dispels any possible claim of ambiguity. It states that the

"offer will expire November 14, 1989, and we must have your

signed acceptance in our hands by 2:00 p.m. on that date." It

then notes that, should Newport accept the offer, the Bank "must

also receive" the progress reports and the lump-sum payment as

promised.

Words are not endlessly malleable. They have meaning

and content. The particular combination of words that the

parties utilized here, taken in the stated sequence, is

susceptible of no reasonable interpretation other than that the

parties intended themselves to be fully bound coincident with

Newport's return of the letter, endorsed "APPROVED AND ACCEPTED,"

by the date and time specified. In contemplation of law, Newport

accepted the terms of the offering letter by signing and

returning it.

B. The Effect of Newport's Consent.

Newport also claims that, even if it accepted the

offer, there remains a question of fact regarding whether, by

doing so, it intended to relinquish its right to sue the Bank for

failure to resume financing the project pursuant to the oral

agreement. This claim rests chiefly on an affidavit from Ronald

Kutrieb, one of Newport's principals, professing his belief that,

in signing the letter, he was not surrendering Newport's rights

13

under the oral agreement.6 In our view, this initiative ignores

both unambiguous language and settled law. We explain briefly.

As we have previously indicated, the plain language of

the November 1 letter is difficult to overcome. To be sure, the

letter made no reference to the earlier oral agreement.

Nevertheless, the Bank did not mince words. The letter

unequivocally stated that the Bank had "decided not to allow

restarting of the project." These words are definite. Their

purport is not contradicted by any other term in the agreement.

The ordinary meaning of the quoted language, taken in context, is

susceptible to no other reasonable interpretation than as an

expression of the parties' mutual agreement that construction

financing for the project would no longer be furnished by the

Bank.

In such clear-cut circumstances, the courts below had

no principled choice but to hold that Newport, by accepting the

offer in the manner indicated, assented to the "no further

financing" term. See Fireman's Fund, 391 A.2d at 102; see also

Theroux v. Bay Assocs., Inc., 339 A.2d 266, 268 (R.I. 1975)

(explaining that a court will not import ambiguity into a

contract that unmistakably expresses the parties' intentions).

Nor did the Kutrieb affidavit create a roadblock en

route to this result. Contracts ordinarily depend on objective

6The Bank's letter transposed two vowels in Kutrieb's name.
Moreover, one of Newport's partners, Joseph J. Dabek, apparently
did not sign the letter. The parties do not mention either the
misspelling or the omission and we, too, deem them
inconsequential.

14

indicia of consent, not on a party's subjective expectations.

When, as in this instance, the parties' intent is made manifest

by the express terms of a written agreement, fairly construed, a

court interpreting the agreement should not look to "some

undisclosed intent that may have existed in the minds of the

contracting parties but [should be governed by] the intent that

is expressed by the language contained in the contract."

Woonsocket Teachers' Guild, 367 A.2d at 205; accord Westinghouse,

410 A.2d at 991 n.10; see also Smith v. Boyd, 553 A.2d 131, 133

(R.I. 1989) (explaining that, under Rhode Island law, objective

manifestations of intent govern contract formation); Mathewson

Corp., 827 F.2d at 853-54 (same; applying Massachusetts law).

Hence, the Kutrieb affidavit raised no genuine issue of material

fact sufficient to preclude the entry of summary judgment. See,

e.g., Singh, 977 F.2d at 23 (affirming summary judgment for

lender on the basis, inter alia, that a litigant may not

subrogate the terms of an unambiguous contract to his supposed

contemplation of its meaning) (applying Massachusetts law);

Cassidy v. Springfield Life Ins. Co., 262 A.2d 378, 380 (R.I.

1970) (stating that, where a contract's terms are clear and

unambiguous, and there are no questions of material fact to be

resolved, the nisi prius court may grant summary judgment).

We see no way around this outcome. The Bank's explicit

disclaimer of any intention to restart the project in the

subsequent letter agreement directly contradicts the supposed

oral agreement (wherein the Bank allegedly agreed to pour more

15

money into the project upon Newport's fulfillment of certain

conditions). Given this direct contradiction, the letter

agreement, being later in time, necessarily superseded any and

all prior oral agreements anent restarting construction. It is,

after all, settled law that, if the terms of a prior oral

negotiation are dealt with, or covered by, a later written

agreement between the parties on the same general subject, then,

presumably, the latter was intended to supersede the former, and

should be so construed. See Rogers v. Zielinski, 170 A.2d 294,

296 (R.I. 1961) (explaining that, if confronted with such a

situation, a court should assume that "the writing was meant to

represent all of the transaction on that element") (quoting 9

Wigmore, Evidence 2430(3) (3d ed. 1940)); Philip Carey Mfg.

Co. v. General Prods. Co., 151 A.2d 487, 492 (R.I. 1959) (holding

that parties to a novation waive any rights they might have had

under the prior agreement); Quinn v. Bernat, 97 A.2d 273, 275

(R.I. 1953) (stating that a complete written agreement becomes

the memorial of the parties' intent, "merging or integrating all

prior oral agreements relating to the subject matter").

C. Lack of Consideration.

Newport also asserts that the letter agreement is

unenforceable for want of consideration. Since the Bank

ultimately foreclosed and retained the right to pursue collection

of the entire indebtedness, this thesis runs, Newport received

nothing of value in return for relinquishing its rights under the

oral agreement. We disagree.

16

The November 1 agreement was supported by valuable

consideration on both sides. For its part, the Bank was willing

to shave approximately half a million dollars from Newport's

outstanding debt. Although Newport would not reap the benefit of

this considerable savings unless and until it made a timely

payment of $881,000, the value of the opportunity, coupled with

Newport's forbearance for the 90-day waiting period, was itself

substantial and furnished valid consideration for Newport's

return promise. See, e.g., Philip Carey Mfg., 151 A.2d at 491-92

(holding that mutual agreement to forbear from asserting

previously acquired legal claims is adequate consideration, as a

matter of law, to support new promises made in a novation);

Phenix Nat'l Bank v. Raia, 28 A.2d 20, 22 (R.I. 1942) ("broadly

speaking, an agreement to forbear to enforce rights under an

original obligation is, under the proper circumstances,

recognized as good consideration for a new obligation"); see also

Higgins v. Mycroft, 92 A.2d 727, 729 (R.I. 1952).

If practiced parties to commercial transactions bargain

for, and receive, consideration that they deem satisfactory and

that the law regards as substantial, it is not a court's role,

absent fraud or other exceptional circumstances, to evaluate the

relative adequacy of the consideration or to reweigh the

soundness of the parties' judgments. See Fall River Nat'l Bank

v. DeMarco, 249 A.2d 900, 903-04 (R.I. 1969).

IV. CONCLUSION

17

We need go no further. In the November 1 letter

agreement, the parties unequivocally agreed that the Bank would

not resume financing the ill-fated construction project. The

letter agreement superseded, and thus extinguished, all prior

negotiations on the same general topic. This means, of course,

that Newport's attempt to sue for a failure to restart the

project pursuant to the parties' earlier oral agreement cannot be

countenanced even if such an agreement existed at one moment in

time.

Affirmed.

18

APPENDIX

November 1, 1989

Newport Plaza Associates, L.P.
c/o Capital Growth Companies
Mr. Ronald E. Kutreib
221 Third Street
Newport, Rhode Island 02840

Gentlemen:

This is to confirm our meeting of October 27, 1989.

Durfee Attleboro Bank has received and reviewed your proposal
dated October 13, 1989, to restart the project. As you know,
your $2,200,000.00 note dated February 8, 1988, remains in
default, as set forth in our letter to you of April 26, 1989.
After our complete review of this proposal, we have decided
not to allow restarting of the project.

However, without waiving any of our rights, we will allow
Newport Plaza Associates, L.P. until February 1, 1990, to pay
the Bank $881,000.00, and if payment is received by said
date, said sum will be accepted as full payment of the Bank's
$2,200,000.00 note dated February 8, 1988. Therefore, if you
accept this offer you must deliver to us no later than 2:00
p.m., February 1, 1990, a certified check payable to Durfee
Attleboro Bank in the amount of $881,000.00.

If you are in agreement with the terms and conditions detailed
above, please so indicate by dating, executing and returning
one copy of this letter for our files. This offer will expire
November 14, 1989, and we must have your signed acceptance
in our hands by 2:00 p.m. on that date. If you accept this
offer, we must also receive detailed weekly written progress
reports on the status of the project and your efforts to
obtain the $881,000.00, which reports will be due every Thurs-
day at 3:00 p.m. via fax machine (508 679-8361).

If you fail to strictly meet all the terms and conditions as
set forth above, we may immediately pursue any and all of our
rights and our remedies to enforce our rights, including, but

19

Newport Plaza Associates, L.P. -2- November 1, 1989

not limited to foreclosure. Time is of the essence in all
respects.

Sincerely,
Durfee Attleboro Bank

Anthony J. Riccitelli
Assistant Vice President

APPROVED AND ACCEPTED:

NEWPORT PLAZA ASSOCIATES, L.P.

By:
Ronald E. Kutreib, partner Date

By:
Joseph J. Dabek, partner Date

By:
James J. Beaulieu, partner Date

Ronald E. Kutreib, guarantor Date

Joseph J. Dabek, guarantor Date

James J. Beaulieu, guarantor Date

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

20