Vitko v. McQuade                    CV-91-731-B    07/15/94

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

Joseph E. Vitko, Jr.

    v.                                   Civil No. 91-731-B

Paul R. McQuade and FDIC, et al.


**O R D E R**

The Federal Deposit Insurance Corporation has moved to enforce an agreement it claims the parties reached to resolve this litigation.  Joseph Vitko, Jr., Paul R. McQuade, and the Pemigewasset Bank support the motion.  William McQuade, Douglas McQuade, and John David (collectively the "Intervenors") oppose the motion.


**I.  Findings of Fact**

After holding an evidentiary hearing on February 14, 1994, and reviewing the exhibits produced during the hearing, I make the following findings of fact:

1.  On or about November 15, 1993, Douglas Gray, attorney for Paul McQuade, VAM Enterprises, Inc., and McQuade & McQuade Investments, Inc., sent a letter via fax and regular mail to John O'Connell, attorney for the FDIC.  The letter purported to accept

a proposal from the FDIC to "resolve the issue of recision now pending in the United States District Court." The proposal described in Gray's letter contained the following essential points:

> (a) transfer of title to Crosby Commons from VAM to McQuade & McQuade Investments, Inc.;
> (b) release of obligation of VAM Enterprises, Inc. under the existing promissory note and other loan documents, except as to 50% of the interest in the Progress Drive property;
> (c) release of Joseph E. Vitko Jr.'s ownership interest in and to the Progress Drive property from any obligation for the existing promissory note of VAM, et al.
> (d) lien to the FDIC on 10 Towle Avenue, Dover, New Hampshire;
> (e) lien on Paul R. McQuade's interest in his pension plan of $100,000; and
> (f) execution and filing of requisite releases to effectuate agreement, together with non-judgmental docket markings.

Gray also represented in the letter that the Intervenors had authorized him to accept the proposal on their behalf (a copy of this letter is reproduced in Appendix A).

2. On or about November 16, 1993, O'Connell sent a letter to Deborah Reynolds, Pemigewasset Bank's attorney, James Noucas, Vitko's attorney, and Attorney Gray, in which he summarized the November 15, 1993 settlement proposal and stated, "this proposal needs to be approved by the FDIC, BankOne New Hampshire Asset

2

Management Corporation, and the loan committee of the Pemigewasset National Bank before it becomes effective." No evidence has been produced suggesting that any of these entities ever accepted the proposal outlined in the November 15 letter.

3. On November 19, 1993, after one or more of the parties informed the Clerk's Office that an agreement in principle had been reached to settle the case, I issued the following order:

> The parties have informed the court that they have reached an agreement in principle to settle the portion of the case that is scheduled for trial on November 30, 1993. Based upon this representation, the case shall be removed from the trial list.
>
> The parties shall complete and file a signed settlement agreement on or before December 2, 1993. This agreement shall be subject to approval by the FDIC and the Bank. The FDIC and the Bank shall have until January 2, 1994 to obtain the approvals necessary to complete the settlement.

4. On or about November 19, 1993, Attorney O'Connell sent Attorney Gray a letter in which he summarized a settlement proposal similar to, but not identical with, the November 15, 1993 settlement proposal. O'Connell preferenced his summary with the following comment:

> As the parties attempt to fashion an agreement in the above-captioned matter, I wish to state the outline of the proposal which Mr. McQuade, BONHAM, and the

3

> Pemigewasset National Bank are working to achieve. The terms subject to approval by BONHAM, the FDIC, and the Pemigewasset National Bank, presently being discussed, are as follows . . . .

5. Between November 15, 1993 and December 8, 1993, Attorneys O'Connell, Reynolds, Noucas, and Gray continued settlement negotiations. The principal sources of disagreement among the attorneys concerned the nature and amount of the additional collateral to be provided by Paul McQuade, and various disputed matters between Paul McQuade and Vitko.

6. At the parties' request, I held status conferences on November 19 and December 6, 1993. Following the December 6, 1993 conference, I issued the following order:

> Pursuant to a settlement conference held on December 6, 1993, the deadline for the parties to submit a signed settlement agreement as referenced in my Order of November 19, 1993, is extended until December 15, 1993. Accordingly, defendant FDIC's motion to extend time in which to submit a settlement agreement is granted to the extent it relates to this order. All other deadlines referenced in my November 19 order remain in effect.

7. On or about December 8, 1993, William McQuade sent O'Connell a letter in which he stated:

> Please be advised that I have conferred with Douglas P. McQuade and John David, and by agreement we are no longer willing to have

4

> our share of the VAM Progress Drive property
> be used as collateral for the Crosby Commons
> loan. You will have to come up with some
> other solution, because the proposal as we
> now understand it is not fair to us.

8. On December 8, 1993, Gray sent O'Connell a letter in which he described the Intervenors' concerns as follows:

> When I heard you say that the FDIC planned to not
> release any funds not realized by 49% of the
> shareholders from a sale, internal or external, of
> the Progress Drive property, without any reference
> to fairness, vis a vis the loan to equity ratio,
> then or now existing; I believed that trouble
> would be brewing. Sure enough, I have now been
> informed by the 49% shareholder group that they
> are no longer willing to have their share of the
> Progress Drive property be used as collateral for
> the Crosby Commons loan.

9. At the parties' request, I held an additional status conference on December 27, 1993. Attorneys Gray, Noucas, and O'Connell attended this conference, as well as William and Douglas McQuade. William McQuade informed me that he had been authorized by his brother and John David to speak on their behalf. William McQuade then explained that he and the other Intervenors were prepared to accept a settlement that was consistent with the terms of a draft settlement proposal that Attorney O'Connell had prepared and faxed to Attorney Gray on November 29, 1993 (a copy of this agreement is attached as Appendix B to this Order). However, he explained that the

5

Intervenors had always understood that, in the event that the Progress Drive property was sold before the mortgage on the property was discharged, the Intervenors would be able to keep their share of the sale proceeds notwithstanding the undischarged mortgage. After reviewing the November 29 draft agreement, I explained to McQuade the draft agreement would not entitle the Intervenors to keep their share of the proceeds from any sale of the Progress Drive property. I also advised the Intervenors to hire an attorney to assist them in settlement negotiations. Finally, I extended the deadline for filing a settlement agreement with the court until January 15, 1994.

10. The parties did not submit an executed settlement agreement by the January 15, 1994 deadline. As a result, I held an evidentiary hearing to enforce the settlement on February 14, 1994. During the hearing, the FDIC, the Pemigewasset Bank, Vitko, and Paul McQuade submitted a proposed settlement agreement. (A copy of this agreement is reproduced in Appendix C to this Order.) William McQuade and Douglas McQuade continued to maintain that the settlement agreement was unacceptable because it did not allow them to retain any proceeds from the sale of the Progress Drive property. They further claimed that they had never agreed to a settlement that required them to pay off the

6

Progress Drive mortgage before they could keep the proceeds from any sale of the property.

## II.  Analysis

The FDIC contends that Gray's November 15, 1993 letter represents a binding settlement agreement.  I disagree.[1]

Attorney Gray's letter purports to accept the FDIC's offer to settle.  However, Attorney O'Connell has consistently maintained throughout this litigation that he lacks the authority to bind his client to a settlement.  Since no evidence was produced to suggest that the FDIC in fact offered to settle in accordance with the terms expressed in the November 15 letter, I can only conclude that, notwithstanding its terms, the letter is a joint offer to settle rather than an acceptance of a prior offer.

It is hornbook law that an offer can be withdrawn at any time prior to acceptance.  RESTATEMENT (SECOND) OF CONTRACTS

---

[1] I need not determine whether this motion is governed by state or federal law, because the legal principles on which the order is based do not vary from jurisdiction to jurisdiction. Mathewson Corporation v. Allied Marine Industries, Inc., 827 F.2d 850, 853 n.3 (1st Cir. 1987) (suggesting that federal law may govern a motion to enforce a settlement of a case filed in federal court).

§ 42 ("an offeree's power of acceptance is terminated when the offeree receives from the offeror a manifestation of an intention not to enter into the proposed contract"); see also John D. Calamari & Joseph M. Perillo, CONTRACTS, 2d ed., 78 (1979). This rule applies with equal force to offers to settle litigation. Mastaw v. Naiukow, 105 Mich. App. 25, 29, 306 N.W.2d 378, 380 (1981) (plaintiff's acceptance of offer to settle when defendant reserved the right to approve settlement is merely an open offer that could be revoked prior to acceptance). Thus, if the Intervenors revoked their offer to settle before it was accepted, the purported settlement agreement is unenforceable against the Intervenors.[2]

The Intervenors plainly signaled their intention to withdraw their offer in William McQuade's December 8, 1993 letter, when McQuade informed Attorney O'Connell that the Intervenors were "no longer willing to have our share of the VAM Progress Drive property be used as collateral for the Crosby Commons loan." The Intervenors made their intentions equally clear to Attorney Gray on the same day when they told him that they "are no longer willing to have their share of the Progress Drive property be

_____

[2]I assume without deciding that Attorney Gray had the authority to make a valid offer on the Intervenors' behalf.

used as collateral for the Crosby Commons loan" because the FDIC and the Pemigewassett Bank would not allow them to keep the proceeds from any sale of the Progress Drive property. While the Intervenors later indicated a willingness to accept the November 29 draft settlement, if it was construed in the manner they suggested, they never wavered from their position that any settlement must allow them to retain their share of the proceeds from any sale of the Progress Drive property. Since neither the FDIC nor the Pemigewasset Bank has ever accepted any offer to settle made by or on behalf of the Intervenors, a binding settlement was never achieved, and the motion to enforce settlement must fail.

## III. <u>Conclusion</u>

Defendants' motion to enforce settlement (document no. 109) is denied.

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

July 15, 1994

cc:  John F. O'Connell, Esq.
     James G. Noucas, Jr., Esq.

9

Deborah Reynolds, Esq.
Douglas Gray, Esq.
Lawrence M. Edelman, Esq.
Jennifer Rood, Esq.
Frank E. Kenison, Esq.