**Liudas KAIRYS, Petitioner,**

v.

**IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.**

**No. 91–2768.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 9, 1992.

Decided Dec. 2, 1992.

As Amended Dec. 3, 1992.

Rehearing and Rehearing En Banc
Denied Feb. 16, 1993.

David E. Springer (argued) Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, Ivars Berzins, Babylon, NY, for Liudas Kairys.

Ira H. Raphaelson, Asst. U.S. Atty., Criminal Div., Chicago, IL, Lori L. Scialabba, Dept. of Justice, Office of Immigration Litigation, Richard L. Thornburg, U.S. Atty. Gen., Washington, DC, A.D. Moyer,

Michael L. Harper, Samuel Der–Yeghiayan, I.N.S., Chicago, IL, Denise N. Slavin, Michael D. Bergman, Betty–Ellen Shave, (argued) Debora D. Caruth, Dept. of Justice, Office of Special Investigations, Washington, DC, for I.N.S.

Before POSNER and COFFEY, Circuit Judges, and SHADUR, Senior District Judge.*

POSNER, Circuit Judge.

In *United States v. Kairys*, 782 F.2d 1374 (7th Cir.1986)—familiarity with which is assumed in this opinion—a different panel of this court upheld the revocation of Liudas Kairys's American citizenship because, having been an armed guard in a Nazi concentration camp, he had not been eligible to become a naturalized citizen of this country. The government then instituted deportation proceedings. The immigration judge, affirmed by the Board of Immigration Appeals, held that Kairys was deportable under (among other provisions) the Holtzman Amendment to the Immigration and Nationality Act, which so far as bears on this case authorizes the deportation of any alien who, under the direction of the Nazi regime or any regime allied with it, "assisted ... in the persecution of any person because of race, religion, national origin, or political opinion." 8 U.S.C. § 1182(a)(3)(E)(i); see 8 U.S.C. § 1251(a)(4)(D). En route to this conclusion the immigration judge and the Board invoked the doctrine of collateral estoppel to bar Kairys from relitigating any of the facts determined in the denaturalization proceeding—the central fact being, of course, that Kairys had been an armed guard in a Nazi concentration camp. Kairys asks us to set aside the order of deportation. If we do not, he will not be able to seek discretionary relief from deportation by asking the Attorney General to suspend or withhold deportation; the Holtzman Amendment bars such relief. 8 U.S.C. § 1254(a).

Now 70 years old, Kairys has lived in this country since 1949. He has designated

---

* Hon. Milton I. Shadur of the Northern District of Illinois, sitting by designation.

Germany as the country to which he would like to be deported if the deportation order is upheld, and Germany has agreed to take him. He does not face prosecution there or, so far as anyone is aware, anywhere else for his wartime activities, as he is not accused of murder or any other crime for which applicable statutes of limitations have not yet run.

 His principal argument is that collateral estoppel either should never be applied in deportation proceedings or should not have been applied to him. The first branch of the argument, rejected in *Schellong v. INS*, 805 F.2d 655, 658–59 (7th Cir.1986), and *Howard v. INS*, 930 F.2d 432 (5th Cir.1991) (per curiam); see also *Palciauskas v. INS*, 939 F.2d 963, 966–67 and n. 9 (11th Cir.1991), is based on the statement in section 242(b) of the Immigration and Nationality Act that the statutory procedure for deportation "shall be the sole and exclusive procedure for determining the deportability of an alien." 8 U.S.C. § 1252(b). The argument persuaded the Ninth Circuit some years ago. *Title v. INS*, 322 F.2d 21 (9th Cir.1963). It should not have. The Supreme Court had already held, and the legislative history makes crystal clear, that the only purpose of the quoted language was to exempt deportation proceedings from the provisions of the Administrative Procedure Act. The language had been added by Congress in order to overrule a decision which had held that the Act did apply to such proceedings. *Marcello v. Bonds*, 349 U.S. 302, 309–10, 75 S.Ct. 757, 761–62, 99 L.Ed. 1107 (1955); *In re Fedorenko*, 19 I & N Dec. 57, 63–64 (1984). *Title* does not even cite *Marcello v. Bonds*. The argument made in *Title*, 322 F.2d at 24 n. 8, and in 2 Kenneth Culp Davis, *Administrative Law Treatise* § 18.-11, at p. 622 (1958), that a judicial decision ought not preclude administrative redetermination of facts committed to the agency for its putatively expert evaluation, has no application to a case such as this. For there is no question that a federal district court is authorized in a denaturalization proceeding—a proceeding within the trial jurisdiction rather than the review jurisdiction of the district court—to find all facts

bearing on denaturalization, centrally including the fact of initial excludability. That such a proceeding takes place in a federal district court, moreover, subject to the usual right of appeal to this court, means that the defendant retains his full Article III procedural rights. He thus cannot complain that the findings sought to be made preclusive against him were found merely in an administrative proceeding. (Not that the argument would be likely to persuade today. *University of Tennessee v. Elliott*, 478 U.S. 788, 797–98, 106 S.Ct. 3220, 3225–26, 92 L.Ed.2d 635 (1986); *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966); *Truck Drivers Local Union No. 807 v. Regional Import & Export Trucking Co.*, 944 F.2d 1037, 1043 (2d Cir.1991).) Given the full and fair judicial hearing to which an alien is entitled in a denaturalization proceeding, there is no reason not to apply the doctrine of collateral estoppel in a subsequent deportation proceeding to bar the relitigation of facts actually litigated and necessarily determined (*Cooper v. Federal Reserve Bank*, 467 U.S. 867, 874, 104 S.Ct. 2794, 2798–99, 81 L.Ed.2d 718 (1984); *Truck Ins. Exchange v. Ashland Oil, Inc.*, 951 F.2d 787, 792 (7th Cir.1992)) in the denaturalization case.

 Is there perhaps some special reason not to apply the doctrine to Kairys's case? Contending that its application is always discretionary, Kairys says that the Board of Immigration Appeals was required to explain the reasoning behind its decision to apply the doctrine, just as it is required to do when deciding a petition for discretionary relief from a deportation order. *Bal v. Moyer*, 883 F.2d 45, 46 and n. 1 (7th Cir.1989) (per curiam); *Wong Wing Hang v. INS*, 360 F.2d 715, 719 (2d Cir. 1966) (Friendly, J.). But in making this argument Kairys misuses the term "discretion." Like all legal doctrines, collateral estoppel has bounds. It does not preclude relitigation in all cases. It is not applied "if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Montana v. United States*, 440 U.S. 147, 164 n. 11, 99

S.Ct. 970, n. 11, 59 L.Ed.2d 210 (1979). If a traffic court judge had found that Kairys had been a concentration camp guard, that finding would not have been entitled to collateral estoppel effect in the deportation proceeding. Cf. 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4423, at p. 221 (1981); *Restatement (Second) of Judgments* § 28, comment j, at pp. 283–84 (1982). Nor if that finding, while made by the district court in the denaturalization proceeding, had been inessential to that proceeding and as a result effectively unreviewable on appeal. *Id.,* § 27, comment h, at p. 258; *Truck Ins. Exchange v. Ashland Oil, Inc., supra,* 951 F.2d at 792. But the existence of principles that limit the scope of a doctrine does not make its application discretionary, in the sense that the tribunal asked to apply it has a free-swinging, uncanalized discretion to apply it or not, so that the main task of the reviewing court is to make sure that the tribunal actually exercised its discretion.

Collateral estoppel is not discretionary in that sense. 18 Wright, Miller & Cooper, *supra,* § 4416, at p. 114 (1992 Supp.); cf. *Federated Department Stores, Inc. v. Moitie,* 452 U.S. 394, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981); *Supporters to Oppose Pollution, Inc. v. Heritage Group,* 973 F.2d 1320, 1325–26 (7th Cir.1992). Kairys quotes the statement in the Supreme Court's decision in *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979), that a tribunal has "broad discretion to determine when it [i.e., collateral estoppel] should be applied." The context of this statement is critical. The Court was discussing the use of collateral estoppel by a nonparty to the original proceeding against the defendant in that proceeding, an extension of the doctrine beyond its conventional core that the Court held was discretionary. No extension of the doctrine is involved in the present case.

Further arguing against the application of collateral estoppel to his case, Kairys complains that in the denaturalization proceeding both the district court and this court "refused to address a telling attack that petitioner made on the key identifica-

tion evidence, the Soviet-produced *Personalbogen.*" This is a reference to Kairys's SS identification card, which was furnished to the Justice Department by the Soviet Union (as it then was) from captured SS files and which contains a thumbprint that Kairys acknowledges is his. The "telling attack" is that the Soviets refused to allow Kairys's document experts to clip a fibre from the thumbprint for tests. This court discussed the thumbprint evidence, noting that "government witnesses testified that the only likely way for the print to appear on the *Personalbogen* was from the defendant's pressing his thumb to the paper." 782 F.2d at 1379. The fact that the panel did not discuss the extent to which this evidence should have been deemed impeached by the Soviets' failure to allow chemical analysis of a fibre hardly establishes the unfairness or inadequacy of the denaturalization proceeding. Procedural fairness does not require an appellate court to discuss every issue raised by an appellant, let alone every word or act that might cast doubt on one piece of evidence. It is not as if the thumbprint evidence stood alone. There was expert testimony that the signature on the card was Kairys's, there were personnel records indicating that a person named Kairys was employed at Treblinka as the government contended—even eyewitness testimony—and there was abundant evidence that he had not been born where or when he claimed.

Kairys also argues that the findings in the denaturalization proceeding should be denied collateral estoppel effect because they rested on admissions of and stipulations to such facts as that Nazi Germany invaded the Soviet Union on June 22, 1941, and that Jews were sent to Treblinka and mistreated there. We are surprised that Kairys would want to put the government to its proof of such facts, which are hardly open to doubt. But he is correct that facts determined by admissions and stipulations ordinarily are not entitled to collateral estoppel effect, because facts so determined are not actually litigated, as the doctrine requires. *Restatement, supra,* § 27, comment e, at pp. 256–57; Fed.

R.Civ.P. 36(b). However, factual determinations made by judge or jury in a case that is actually litigated are not deprived of collateral estoppel effect merely because the determinations rest in part on admissions or stipulations. 1B James William Moore, Jo Desha Lucas & Thomas S. Currier, *Moore's Federal Practice* ¶ 0.444[4], at p. 817 (1992). Most such determinations do.

A contrary rule might discourage the use of admissions and stipulations, lest that use deprive the winning party of a judgment that he could use in a subsequent proceeding to foreclose relitigation of the facts that had been determined in his favor—or, conversely, might, we acknowledge, encourage admissions and stipulations, by making them less costly in future consequences for the concessionary party. The decisive reason for giving them collateral estoppel effect is that a lawyer's recognition that the evidence is so stacked against him on some point that a failure to admit it will open him to sanctions under Fed. R.Civ.P. 37(c) is as good an indication of where the truth probably lies as a determination by a judge or a jury. *In re Cassidy,* 892 F.2d 637, 640 n. 1 (7th Cir.1990), questioned whether a judgment based *solely* on an admission could be thought a determination of actually litigated facts. But that is different from a case in which the party later sought to be estopped had put up a fight, conceding only the points hopelessly against him.

■ Likewise futile is Kairys's argument that collateral estoppel was improper here because the Soviet Union had given the Justice Department evidence for use in denaturalization proceedings as part of an unwritten, sub rosa, unratified, and therefore thoroughly illegal "Moscow Agreement" between the Director of the Justice Department's Office of Special Investigations and the office of the Soviet Procurator General, which came to light after the denaturalization case was tried. Supposing everything Kairys says about the so-called "Moscow Agreement" is correct, we do not see what bearing it has on collateral estoppel. The evidence obtained from the Soviet Union is neither more nor less reliable because it was obtained by an agreement that did not (if it did not) comply with U.S. laws that concern not evidentiary reliability but the relations within and between the executive and legislative branches of the federal government. To prevent the evidence, despite its reliability, from being considered, as a sanction for improper government behavior, would be inconsistent with the Supreme Court's decision not to apply the exclusionary rule of the Fourth Amendment in deportation proceedings. *INS v. Lopez–Mendoza,* 468 U.S. 1032, 1050, 104 S.Ct. 3479, 3489, 82 L.Ed.2d 778 (1984).

■ Kairys points to evidence that came to light after the denaturalization proceeding and that, he argues, casts doubt on the accuracy of the determination made in that proceeding. He could have used such evidence to move to reopen the judgment in the denaturalization proceeding on the ground of newly discovered evidence, Fed. R.Civ.P. 60(b), but alternatively he can use it to oppose giving that judgment collateral estoppel effect in the deportation proceeding. *Khandhar v. Elfenbein,* 943 F.2d 244, 249 (2d Cir.1991); *Applied Materials, Inc. v. Gemini Research Corp.,* 835 F.2d 279, 281 (Fed.Cir.1987); *Springfield Television Corp. v. FCC,* 609 F.2d 1014, 1019 (1st Cir.1979). With the collapse of the Soviet Union it is now acknowledged that the KGB employed accusations of collaboration with the Nazis to discredit the Soviet Union's political opponents. A recent article in the Lithuanian press, a translation of which is attached to Kairys's reply brief, reports on the contents of a KGB file found in Lithuania. The file contains a recommendation, made in 1980, that the KGB, "to impede the anticipated consolidation of Zionist and Lithuanian emigre national organizations, and to sharpen the enmity between them," furnish the American Jewish community with information about certain Lithuanian emigres, including "L. Kairys," who currently reside in the United States. Kairys, who was indeed active in the Lithuanian nationalist movement in the United States and thus a natural target for Soviet disinformation, asks us to infer that the KGB framed him to impede the move-

ment and sow enmity between it and Zionism.

Of course the KGB was not above subtle forgeries designed to discredit state enemies, though nothing in the article suggests forgery. The KGB would have an even greater interest in using true information about Nazi collaboration to foment distrust and hostility between Lithuanians and Jews than in forging evidence of such collaboration; forgeries are sometimes exposed. At all events, whatever the significance of the article and of other recent press material that Kairys presses upon us, including accusations of improprieties by the director and staff of the Office of Special Investigations and the serious doubts that have been raised about the identity of another denaturalized citizen accused of having been a Nazi concentration camp guard, John Demjanjuk, now appealing a sentence of death in Israel, Kairys has not made a case for reversing the Board of Immigration Appeals on the ground that it invoked collateral estoppel.

We must distinguish between evidence that came to light between the denaturalization proceeding and the deportation hearing and evidence that has come to light since. The article in the Lithuanian press and the doubts about Demjanjuk's identity are in the second category, and the Board cannot be faulted for having failed to consider the bearing of evidence that did not yet exist. As for the earlier evidence, it was nothing new. Kairys argued throughout the denaturalization proceeding that the Soviet Union had forged the evidence against him, and thus was out to frame him. The district court and this court considered the possibility, but rejected it. Just because the Soviet Union had no scruples about forging evidence, it does not follow that every bit of evidence that it furnished the U.S., or even every bit of such evidence that implicated a Lithuanian nationalist, was forged. At all events this is a question about the correctness of the findings in the denaturalization proceeding rather than about the fullness and fairness of the hearing afforded Kairys by that proceeding. A hearing is not unfair merely because one of the issues in it is whether evidence has been forged.

Concerning the evidence that has come to light since the deportation hearing, much of it was tendered to the Board of Immigration Appeals in a motion to reopen (Kairys's third) which he made earlier this year. The Board denied the motion in March, and Kairys has not appealed. He claims to have fresh evidence, in particular the Lithuanian article that we mentioned—the translation is not dated but the article itself was published in April—though it contains no direct and perhaps no inferential evidence of forgery. We cannot consider that evidence on this appeal. All newly discovered evidence must be tendered in the first instance to the Board, and not to us. There are no limitations on the number of successive motions to reopen deportation proceedings that may be filed, 8 C.F.R. §§ 3.2, 3.8, 103.5 (1992), although the Attorney General has been instructed by Congress to promulgate such limitations by regulation. Immigration Act of 1990, P.L. 101–649, § 545(d). We however are confined to the record properly before us. It does not contain the Lithuanian article or any of the other so-called newly discovered evidence. It furnishes no basis for our reexamining the findings made in the denaturalization proceeding and affirmed in the earlier decision of this court.

■ The remaining issue is whether Kairys's service as an armed guard (as distinct from an inmate pressed into camp service) at the Treblinka work camp (a labor camp attached to the better-known Treblinka concentration camp) made him deportable under the Holtzman Amendment as one who had assisted in the persecution of Jews. That Jews were persecuted at the work camp is not in question, and that as an armed SS guard (and in fact platoon commander) Kairys "assisted" in that persecution, whether or not he committed a specific atrocity by beating a Jewish inmate to death or otherwise mistreating him beyond what is implicit in serving as a guard at such a camp, is settled in this circuit by *Schellong v. INS, supra,* 805 F.2d at 660–61; see also *Kulle v. INS,* 825

F.2d 1188, 1192 (7th Cir.1987); cf. *United States v. Schmidt*, 923 F.2d 1253, 1258 (7th Cir.1991). (*Petkiewytsch v. INS*, 945 F.2d 871, 880 (6th Cir.1991), contains a contrary dictum, but is distinguishable as a case of involuntary service.) If the operation of such a camp were treated as an ordinary criminal conspiracy, the armed guards, like the lookouts for a gang of robbers, would be deemed coconspirators, or if not, certainly aiders and abettors of the conspiracy; and no more should be required to satisfy the noncriminal provision of the Holtzman Amendment that makes assisting in persecution a ground for deportation. As for Kairys's argument that he should be allowed to defend himself on grounds of necessity—to prove that he was coerced to serve as a guard at Treblinka—there is no evidence of this, and any inference of coercion is inconsistent with his promotion to platoon commander—one of three promotions, in fact, that he received while in the Nazis' service.

The order to deport the petitioner to Germany is

AFFIRMED.