# United States Court of Appeals

## For the First Circuit

No. 07-1414

ERNEST and KARLA EDWARDS,

Plaintiffs, Appellants,

v.

LEXINGTON INSURANCE COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella, Circuit Judge,
and Schwarzer,* Senior District Judge.

Verne E. Paradie, Jr. with whom Trafton & Matzen, LLP was on brief for appellants.
John S. Whitman with whom Richardson, Whitman, Large & Badger was on brief for appellee.

November 5, 2007

---

*Of the Northern District of California, sitting by designation.

**BOUDIN**, <u>Chief Judge</u>. On October 11, 2002, Ernest Edwards suffered injuries during a hunting excursion when a safety harness securing him to a tree malfunctioned, causing him to fall seventeen feet to the ground. On July 9, 2004, Edwards filed suit in the federal district court in Maine against the safety harness's manufacturer, Game Tracker, Inc. (Edwards' wife was also a plaintiff in the action but nothing turns on her participation.) On February 8, 2006, Edwards obtained a $1,964,931.23 default judgment against Game Tracker, which by then had filed for bankruptcy protection.

Unable to execute on the judgment against Game Tracker, Edwards (and his wife) sued in the same federal court under Maine's reach and apply statute, 24-A M.R.S.A. § 2904 (2000), seeking to collect from Lexington Insurance Company, Game Tracker's insurer.[1] Lexington had previously received notice of Edwards' suit against Game Tracker and had disclaimed coverage under all three policies that Lexington had issued to Game Tracker and its affiliates.

In due course, Lexington moved for summary judgment, which the district court granted, finding that none of the three policies at issue covered Edwards' claim against Game Tracker: a

---

[1]Maine's reach and apply statute allows an injured party who has obtained a final judgment against an insured tortfeasor to institute a separate civil action against the insurer to satisfy the judgment if, among other things, the tortfeasor "was insured against such liability." 24-A M.R.S.A. § 2904; <u>see also</u> <u>Ashe</u> v. <u>Enterprise Rent-a-Car</u>, 838 A.2d 1157, 1162 (Me. 2003).

"claims-made policy"[2] because Edwards had failed to provide notice of the claim to Game Tracker or Lexington within the required period; an "occurrence policy" because the policy contained an endorsement excluding injuries caused by safety belts and harnesses; and a third policy both because notice was not timely made and because the insured was Gorilla, Inc., not Game Tracker. Edwards now appeals the rulings as to the first two policies.

We review a district court's entry of summary judgment de novo, taking the evidence in the light most favorable to the non-moving party and indulging reasonable inferences in his favor. Iverson v. City Of Boston, 452 F.3d 94, 98 (1st Cir. 2006). The moving party is entitled to summary judgment if the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Claims-Made Policy--Policy #6478065. Edwards first seeks satisfaction of the judgment against Game Tracker under a claims-made policy issued by Lexington to Game Tracker. The policy would

---

[2]"Claims-made" policies cover claims arising out of incidents that occurred during or prior to the policy period, depending on the terms of the policy, but only if a claim is made during the policy period. With claims-made policies, the insured event is the claim. By contrast, "occurrence policies" cover insured events that occur during the policy period. With occurrence policies, the insured event is the occurrence, not the claim. See DiLuglio v. New Eng. Ins. Co., 959 F.2d 355, 358 (1st Cir. 1992); 7 Russ & Segalla, Couch on Insurance § 102:20 (3d ed. 1997 & Supp. 2007).

-3-

have covered an incident such as the one suffered by Edwards, but only if notice of a claim was provided to either Game Tracker or Lexington during the claim period, which ran from April 2002 to June 2003.

During discovery, Lexington sought proof that Edwards had provided notice within the claim period. Although asked the question three different ways, Edwards could not state that he had provided notice to Game Tracker, its affiliates, or Lexington during the notice period. Instead, he said that attempts to locate and contact Game Tracker were made in the winter of 2003, that his attorney at some unspecified point had telephone conversations with one or more Game Tracker representatives, and that formal notice was provided to Game Tracker in January 2004--after the required cut-off date.

Based on Edwards' failure to provide evidence establishing timely notice--evidence that one would expect to be available to a plaintiff or his attorney if timely notice was given--the district court found that there was no genuine dispute of material fact and that for lack of timely notice, the claims-made insurance policy did not cover Edwards' claim. Edwards does not now argue that notice was timely provided but instead offers reasons why the policy's unambiguous notice requirement should not preclude coverage.

Edwards first argues that Lexington breached its duty to defend Game Tracker in Edwards' initial action against Game Tracker. On this premise, he argues that Lexington is estopped from disclaiming coverage now; alternatively, Edwards says that under Maine law Lexington at least bore the burden of proving non-coverage as a result of that earlier alleged dereliction in failing to provide a defense.

Edwards was not a party to the insurance contract, or a third party beneficiary, or the insured's assignee. Maine's reach and apply statute places Edwards in Game Tracker's shoes to the extent he seeks whatever indemnification might have been owed to Game Tracker under its insurance policies. Less clear is Edwards' ability to claim benefits or advantage based on other contractual duties owed by the insurer to the insured, such as the duty to defend.[3]

Indeed, the extent to which an injured third party steps into the shoes of the insured when proceeding against the insurer is a question that arises in diverse contexts, affecting the claims available to the injured party and the defenses available to the

_____

[3]Compare Smith v. Allstate Ins. Co., 483 A.2d 344, 346 (Me. 1984) (injured third party "has no judicially protectible interest in whether [the insurer] or independent counsel secured by [insured] provides [the insured's] defense in [a] negligence action against him"), with Restatement (Second) of Judgments § 57, cmt. g (1982) ("When allowed to proceed directly against the indemnitor, the injured party does so by subrogation and has the benefit of the same rules of preclusion and estoppel as the indemnitee would have.").

-5-

insurer. Case law varies among the states.[4] The answer may also vary depending on the nature of the insurance contract, the language of the statute under which the injured third party is proceeding, and the balancing of competing policy concerns.

The Maine SJC has not yet clearly determined whether an injured third party may generally seek the collateral benefits of a breach of the duty to defend which would otherwise belong to the insured. Compare Elliott v. Hanover Ins. Co., 711 A.2d 1310, 1311 (Me. 1998) (allowing claim by an injured third party who was an assignee of the insured), with Smith v. Allstate Ins. Co., 483 A.2d 344, 346 (Me. 1984) (injured third party "has no judicially protectible interest in whether [the insurer] or independent counsel secured by [insured] provides [the insured's] defense in [a] negligence action against him").

However, Edwards' estoppel argument was expressly rejected in Elliott, which said that "[a]n insurer that breaches its duty to defend . . . is not estopped from asserting noncoverage as a defense in a subsequent action brought by the insured or the

---

[4]Compare, as to an insurer's bad faith refusals to settle, Thompson v. Commercial Union Ins. Co. of New York, 250 So. 2d 259, 264 (Fla. 1971), with Moradi-Shalal v. Fireman's Fund Ins. Cos., 758 P.2d 58, 68 (Cal. 1988); see also Right of Injured Person Recovering Excess Judgment Against Insured to Maintain Action Against Liability Insurer for Wrongful Failure to Settle Claim, 63 A.L.R.3d 677 (1975); and compare, as to insurer's use of a defense like non-cooperation when sued by injured party, Peters v. Saulinier, 222 N.E.2d 871, 874 (Mass. 1967), with Michaud v. Mut. Fire, Marine & Inland Ins. Co., 505 A.2d 786, 788-89 (Me. 1986).

insured's assignee." 711 A.2d at 1313; see also Bucci v. Essex Ins. Co., 393 F.3d 285, 295 (1st Cir. 2005). Elliott does say that an insurer that breached its duty to defend may be bound in an indemnity action by "any factual issues that might have been litigated in the underlying negligence action," 711 A.2d at 1314, but here the timing of the claim was not among the facts necessary to prove the insured's liability. See Bucci, 393 F.3d at 296.

Nor has Edwards established that the duty to defend was breached, which under Maine law might have triggered a shift in the burden of proof as to coverage for the purpose of indemnification. Elliott, 711 A.2d at 1313-14. The problem for Edwards is that in order to shift the burden of proof with regard to indemnification, he first had to show that there was a breach of the duty to defend. And to do so, he had to prove that a claim was timely made; otherwise, there was neither a duty to defend nor to indemnify the insured.

The evidence as to notice is clearly inadequate to prove timely notice was given. Lexington, in an affidavit and in response to an interrogatory from Edwards, said that it did not receive notice of Edwards' claim from Edwards, Game Tracker, or anyone else, until July 9, 2004, over a year after the expiration of the claim period. And, as already explained, Edwards offered evidence only that "'formal written' Notice of Claim," was provided

to Game Tracker in January of 2004, that is, after the close of the claim period.

Edwards counters with the "eight corners rule," according to which the duty to defend is determined "by comparing the allegations in the underlying complaint with the provisions of the insurance policy. If a complaint reveals a potential . . . that the facts ultimately proved may come within the coverage, a duty to defend exists."[5] Edwards argues that therefore the district court should have compared the complaint in the underlying action with the insurance policy to determine whether there was a duty to defend, and that the district court erred in considering extrinsic evidence relating to notice.

Grounded in policy considerations, the so-called "eight corners rule" is appropriately invoked in the context of occurrence policies because the complaint in describing the incident will usually provide adequate information to determine whether--at least as alleged--the incident is within the scope of the insurance policy. See Liberty Mut. Ins. Co. v. Graham, 473 F.3d 596, 599-600 (5th Cir. 2006). However, the rule cannot be rigidly applied in the context of claims-made policies where the determinative event is the timing of the claim, a fact that likely will be--and in this

---

[5]Me. State Acad. of Hair Design, Inc. v. Commercial Union Ins. Co., 699 A.2d 1153, 1156 (Me. 1997) (internal quotation marks and citations omitted) (alteration in original); see also Anderson v. Va. Sur. Co., 985 F. Supp. 182, 188 (D. Me. 1998).

case was--irrelevant to the merits of the underlying tort suit, and therefore absent from the pleadings.[6]  The district court thus did not err in finding that Edwards failed to show a wrongful refusal to defend, given that the uncontradicted evidence established that their claim was not timely made.

Turning to the insurance contract itself, Edwards argues that the claims-made policy is ambiguous.  He does not say that the language of the policy is ambiguous; in fact, the policy states in capital letters, "CLAIMS-MADE POLICY.  READ THE ENTIRE POLICY CAREFULLY" and "CLAIMS-MADE COVERAGE.  PLEASE READ THE ENTIRE FORM CAREFULLY."  Further, the policy states clearly: "This insurance applies to 'bodily injury' and 'property damage' only if . . . [a] claim for damages . . . is first made against any insured . . . during the policy period or any Extended Reporting Period."  In this case the policy did extend the reporting period for 60 days but only until June 2003.

Instead Edwards argues that because the policy did not provide retroactive coverage--i.e., coverage for incidents that occurred before the policy effective date, notice of which was received during the policy period--as is fairly standard with

---

[6]See Patrons Oxford Mut. Ins. Co. v. Garcia, 707 A.2d 384, 386 (Me. 1998) (noting exception to "eight corners" rule where insurer denies duty to defend based on lack of timely notice); see also Hasbrouck v. St. Paul Fire & Marine Ins. Co., 511 N.W.2d 364 (Iowa 1993) (upholding grant of summary judgment to insurer based on evidence outside the scope of the pleadings where coverage was denied based on tardy notice under a claims-made policy).

claims-made policies, the policy is unclear as to whether it is a claims-made policy or an occurrence policy. But a claims-made insurance policy is not rendered ambiguous simply because it does not resemble all policies in its class; and Edwards has not identified any language in the policy that would muddy the claims-made requirement just quoted. See Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 35 (1st Cir. 2001).

Edwards' ambiguity argument blends into his further contention that Game Tracker's claims-made policy offended public policy by offering neither the prospective benefits of an occurrence policy nor the retrospective benefits of a standard claims-made policy. This in turn might be best understood as an argument that the terms of the policy were unconscionable. See Truck Ins. Exch. v. Ashland Oil, Inc., 951 F.2d 787, 789-90 (7th Cir. 1992).

Specifically, Edwards relies on Sparks v. St. Paul Ins. Co., 495 A.2d 406 (N.J. 1985), a case in which the New Jersey Supreme Court held that a claims-made professional liability insurance policy that "affords no retroactive coverage whatsoever during its initial year of issuance" was void as against public policy. Id. at 415. But even the Sparks court recognized that "'[c]laims made' policies with no retroactive coverage might be appropriate in certain contexts. For example . . . to the professional who changes from 'occurrence' to 'claims made'

-10-

protection." Id. at 415 n.4. As Judge Posner explained in Ashland Oil,

> [I]t is commonplace for issuers of claims-made policies to limit retroactive coverage by specifying a cut-off date, such as the date of the first claims-made policy issued by the insurer to this insured, so that claims based on occurrences before that date are excluded from coverage. For protection against old occurrences the insured must look to his occurrence policies.

951 F.2d at 790 (citation omitted).

That is just what happened here. Game Tracker had purchased occurrence policies at least as early as April 1998. Any liability deriving from incidents that occurred during the four years prior to the adoption of the claims-made policy would have been covered under the earlier occurrence policies. There was simply no reason for the claims-made policy to afford retroactive coverage for incidents that were already covered by existing occurrence policies.

Finally, Edwards argues that Lexington exacted "an outrageously high premium, and outrageously high self insured retention limit" given the narrow scope of coverage. Edwards has provided no data to show that the premium and self-insurance retention rates were in fact "outrageously high." More broadly, "we do not consider it our place to 'rewrite contracts freely entered into between sophisticated business entities.'" AccuSoft Corp. v. Palo, 237 F.3d 31, 41 (1st Cir. 2001) (quoting Mathewson

Corp. v. Allied Marine Indus., Inc., 827 F.2d 850, 855 (1st Cir. 1987)).

Edwards claims that "Lexington had virtually no risk despite a $525,000 premium," but if Edwards had provided timely notice to Game Tracker, Lexington would have sustained a loss on the policy. Lexington had in fact sustained substantial losses due to the high volume of claims against Game Tracker. Based on that history, it is unsurprising that Lexington insisted upon high premium and self-insurance retention rates despite the narrow scope of coverage.

Occurrence Policy--Policy #1320657. Alternatively, Edwards seeks coverage under Game Tracker's occurrence policy, which covered incidents occurring between April 2002 and April 2003, regardless of when the claim was made. Unfortunately for Edwards, that policy contains an exclusion--Endorsement #8--that disclaims coverage for injuries arising out of the use of "any product that is attached or used on a tree; including [but] not limited to the following: . . . safety belts and harnesses."

Edwards argues that the effective date of the endorsement is ambiguous, raising a genuine factual dispute as to whether the exclusion was in effect at the time of his accident. He also claims ambiguity as to whether the endorsement includes products manufactured by Game Tracker, as opposed to its affiliates; this in turn, he says, triggers canons that the insurer bears the burden of

-12-

proving an exclusion, and that such exclusions are narrowly construed. See Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co., 220 F.3d 1, 4 (1st Cir. 2000).

Neither argument can succeed. While there is no effective date written on the endorsement page itself, the policy includes a forms schedule listing the effective date of the endorsement as April 8, 2002. Further support for Lexington can be found in another endorsement--Endorsement #9--which amends Endorsement #8, and which has an effective date of April 8, 2002. Endorsement #9 can hardly predate the endorsement that it purports to modify.

Lexington also submitted an affidavit from the manager responsible for Game Tracker's occurrence policy. The affidavit stated that Endorsement #8 was effective as of April 8, 2002, and explained that the effective date was listed on the forms schedule rather than on the endorsement itself because the form used for that endorsement (and another endorsement not at issue in this case) did not contain a blank space for the effective date.

Edwards also argues that the schedule for the policy lists under the classification description, "treesteps, harnesses and archery accessories," suggesting that the harness he used was initially a covered product. Lexington's affidavit explained that the classification was an error corrected by Endorsement #11, which redefines the description as "archery, arrows and hunting

-13-

accessories." Edwards may be right that Endorsements #8 and #11 were contemporaneous, but Endorsement #11 was effective April 8, 2002, six months before Edwards' accident.

Determining the insured to which the exclusion applies is slightly more complex, although not less clear. See Peerless Ins. Co. v. Brennon, 564 A.2d 383, 386 (Me. 1989). The endorsement excludes coverage for injuries "arising out of any of 'your products' shown in this Schedule." The term "your products" in turn is defined as "Any goods or products . . . manufactured . . . by You." "You" is then defined as "the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy." Finally, the "Named Insured" is defined as including six entities, including Game Tracker.

Thus any injury caused by a defect in Game Tracker's harness is excluded from coverage by the terms of Endorsement #8, and its various cross-references through the definitional provisions of the policy. There is no ambiguity. Edwards' last argument, like his others, fails, and summary judgment against him was properly entered.

        Affirmed.